# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1456 | **DATE** | 1/13/2005 |
| **CASE TITLE** | Jeffery Hargett, et al vs. Carol Adams, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Plaintiffs' demand for Declaratory Relief is GRANTED insofar as the TDF's prior SMS was unconstitutional and Defendants failed to establish that Plaintiffs' claim on this issue was moot, but any remaining claims for declaratory relief are DENIED. Plaintiffs' demand for injunctive relief is DENIED with respect to this and all other claims.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JAN 1 4 2005 | |
| ✓ | Docketing to mail notices. | date docketed | |
| ✓ | Mail AO 450 form. | | 163 |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| WAP | courtroom deputy's initials | date mailed notice | |
| | | mailing deputy initials | |
| | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

JAN 1 3 2005

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

JEFFERY HARGETT, et al.,

        Plaintiffs,

     v.

CAROL ADAMS, et al.,

        Defendants.

Case No. 02 C 1456

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

The Plaintiffs, individuals who have been civilly committed under the Illinois Sexually Violent Persons Commitment Act, 725 ILCS 207/1 et seq. (the "SVP Act"), brought this suit on behalf of themselves and a class of all other similarly situated individuals challenging the conditions of confinement and quality of treatment at the Joliet Treatment and Detention Facility (the "TDF"). The Defendants are the Director of the Illinois Department of Human Services and various officials at the TDF.

Under the SVP Act, an individual who has been convicted (or found not guilty by reason of insanity) of a sexually violent offense may be detained indefinitely at the TDF if he is found to suffer from a "mental disorder that makes it substantially probable that [he] will engage in acts of sexual violence." 725 ILCS 207/40(a). The SVP Act defines a mental disorder as "a congenital or acquired condition affecting the emotional or volitional

capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b). The civil commitment lasts until the individual "is no longer sexually violent." 725 ILCS 207/40(a).

Plaintiffs raise a series of substantive due process constitutional claims that fall under two broad categories: (1) the conditions of confinement are impermissibly restrictive, and (2) the sex offender treatment provided is inadequate. Specifically, Plaintiffs contend, among other things, that the physical structure and layout of the TDF creates a prison-like environment that is counter-therapeutic and inappropriate for the treatment-based nature of Plaintiffs' civil confinement. In addition, Plaintiffs claim that the TDF staff imposes excessive restrictions on personal movement, conducts inappropriate room and personal searches, and improperly uses seclusion as a vehicle for punishment, in violation of accepted professional standards.

Plaintiffs also contend that the treatment provided at the TDF is constitutionally inadequate. They claim that the TDF violates accepted professional standards pertaining to informed consent and access to treatment. Specifically, Plaintiffs are required to sign a consent form that purportedly contains false and misleading statements, as well as a waiver of confidentiality that is excessively broad. Plaintiffs also complain of the TDF's practice of disclosing patient records to the Illinois Attorney General. In addition, Plaintiffs challenge the adequacy of the treatment

provided at the TDF, claiming that it relies on ineffective techniques, such as arousal reconditioning and polygraph use, deprives patients of proven efficacious medications, and lacks sufficiently clear goals and requirements for successful completion of treatment. Indeed, Plaintiffs note that in the five-year history of the program, only a handful of patients have been released. Although Plaintiffs challenge the conditions and treatment at the TDF, they do not mount a facial challenge of the SVP Act itself.

Defendants initially respond that many of Plaintiffs' claims are moot in light of recent changes in policies and practices. They also contend that housing Plaintiffs in a facility that has similarities to a correctional setting does not transform the TDF's program into an essentially punitive program. In addition, Defendants argue that the security measures are reasonable and necessary precautions related to legitimate security needs for both patients and staff. Defendants also contend that the seclusion standards established by psychiatric organizations are not applicable because the patient population at the TDF is different in kind from the type found at psychiatric hospitals, and, moreover, the SVP Act specifically exempts the TDF from complying with the seclusion provisions in the Illinois Mental Health and Developmental Disabilities Code.

With regard to Plaintiffs' treatment-related claims, Defendants argue, among other things, that Plaintiffs merely point

to areas of professional disagreement, which cannot amount to constitutional violations. Specifically, Defendants contend that arousal reconditioning and polygraph use are well-established techniques utilized in the treatment of sex offenders. Defendants also note that the treatment program has established goals for progress, and that several patients have been released, even without completing all phases of the treatment.

## II. **FINDINGS OF FACT**

### A. **Claims Pertaining to Conditions of Confinement**

### *The TDF's Physical Structure and Layout*

1. The physical structure of the TDF is more-akin to a high-security, prison-like facility, rather than a low-security facility or traditional mental health treatment facility. Plaintiffs' correctional facilities expert, Steve Martin, presented credible testimony showing certain functional similarities between the TDF and high-security facilities, including numerous guard and observation posts, a central security system, continually-locked doors, small prison-like rooms, invasive searches and significant restrictions on movement.

2. Plaintiffs' expert Dr. Metzner presented credible testimony showing that the TDF's physical layout was not conducive to a positive therapeutic milieu. Dr. Metzner, however, also conceded that effective psychotherapy can – and often does occur – in correctional environments that are significantly more restrictive

- 4 -

and prison-like than the one at the TDF.  Similarly, Dr. Berlin, Plaintiffs' expert, conceded that effective psychotherapy can occur within a prison setting.

3. Thus, the Court finds by a preponderance of the evidence that although the physical structure of the TDF does not facilitate a positive therapeutic environment, it is not, by itself, a significant impediment to the delivery of effective treatment.  As indicated below, other elements of the treatment program overcome the counter-therapeutic features of the TDF's physical structure.

### *Restrictions on Movement*

4. The restrictions on movement at the TDF are more consistent with a high-security correctional facility than a minimum or medium-security prison.  Many of the practices pertaining to restrictions on movement and other restrictive practices were imported wholesale from practices established through the Department of Corrections, without full consideration of the appropriateness of all such practices in light of the patient population at the TDF.  With the exception of those patients on advanced (AGE) status, patients' room doors are routinely locked throughout the day and night, and patient must request entry and exit to their room.  When outside of their rooms, most patients are routinely escorted by security personnel, and must pass through numerous locked doors before reaching the secure yard.

5. A Minnesota sex offender program operating under a comparable statutory scheme for civilly detaining and treating violent sex offenders provided a significantly less-restrictive environment than the TDF, but did not have significantly greater assaultive behavior from its patients. For instance, patients in the Minnesota program had keys to their rooms and could move around the facility with greater freedom than those at the TDF. However, as Dr. Schlank testified, the Minnesota program found that its level of freedoms and privileges created an unintended counter-therapeutic effect and treatment disincentives because patients began to prefer a continued stay at the facility, as opposed to working diligently in treatment to secure release.

6. Although the large majority of TDF patients are not assaultive toward staff or other patients, Defendants presented unrebutted evidence of numerous assaults on staff and between patients that warrant certain heightened restrictions on movement. In addition, Defendants showed that there are also legitimate concerns pertaining to the security of personal property within rooms that relate to rooms being locked, at least with respect to the locking of rooms after a patient has exited the room. Thus, the preponderance of the evidence shows that although the overall restrictions on movement at the TDF may be greater than those absolutely necessary in light of the patient population at the TDF, there are nonetheless legitimate operational and security concerns behind many of these restrictions.

### *Room and Personal Searches*

7. Patients' rooms are routinely searched for contraband. Although this feature is more akin to a prison environment, as opposed to a forensic mental hospital or other treatment facility, Defendants presented evidence that numerous items, including a makeshift knife ("shank") and devices to conceal contraband, have been uncovered as a result of these searches. Thus, there are legitimate institutional security concerns underlying the room searches.

8. The TDF's prior policy was to strip search every patient before and after every visit, including visits with attorneys. Under current policy, strip searches have been replaced with a scanning device (the "Rapiscan") that does not require the patient to unclothe. There was credible testimony that the TDF intended to use the Rapiscan (or a similar device) as a permanent replacement for automatic strip searches. The device cost more than $115,000 and is under a one-year maintenance program. Defendants testified that they will extend the maintenance contract for four years. In addition, there was credible testimony that the TDF staff disliked performing the strip searches. If the Rapiscan device fails mechanically, however, Defendants will revert to routine strip searches until the device is fixed.

9. Taken together, the Court finds by a preponderance of the evidence that the TDF intends to use the Rapiscan as a permanent replacement for automatic strip searches on all patients.

### Use of the "Black Box"

10. The Black Box is a security instrument that covers the linking chain and keyhole on handcuffs, and is intended to make it more difficult for a person to remove handcuffs. The TDF began using the Black Box after a successful escape by two patients during transport to court. Under prior policy, the TDF used the Black Box on all patients that were being transported off-site. Under current policy, the TDF will now use individualized risk assessments to determine the necessity of the black box.

11. The Court finds that there are legitimate security concerns underlying the past and present use of the Black Box.

### Use of Special Management Status ("SMS")

12. Special or Secure Management Status ("SMS") refers to the status and set of conditions that a patient may be placed under when he is determined to be a danger to himself or others. The most common reason a patient is placed on SMS is assaultive or threatening words or behaviors aimed toward another patient or staff.

13. On or about September 2004, the TDF amended its long-standing policy pertaining to the SMS. The following findings of

fact, unless otherwise noted, pertain to the terms stated in the new policy.

14. The initial determination of whether a patient is to be placed provisionally on SMS is made by a Security Therapy Aide (the "STA"), who is considered security, not treatment, personnel. STAs typically are not trained in the diagnosis or treatment of mental disorders. After a STA makes the initial SMS decision, the patient is directed to his room, and confined within (*i.e.*, the door to his personal room is locked). The patient is not restrained within his room (*i.e.*, five-point restraints or other devices are not used to restrain the patient). If the patient is not showing suicidal ideation or self-injurious behavior, he typically retains the right to use all personal items in his room, including, if available, the television, music players, and books.

15. The vast majority of patients placed on SMS comply with orders to go to their room and no staff physical intervention is typically required to place the patient in his room.

16. The administrator on duty reviews the STA's decision and has the authority to override the STA's decision. Once the patient is on SMS, the Clinician on Call is notified to perform an initial face-to-face medical and psychiatric assessment, or, if after hours, direct a registered nurse to conduct the assessment.

17. Under the terms of the new policy, a nurse (or, if available, the Clinician on Call) performs a psychiatric screen for

suicidal or psychotic symptoms within one hour of placement on SMS. Under current policy, individuals with suicidal ideation or engaging in self-injurious behavior may be placed on Emergency Mental Health Status ("EMHS"). A patient on EMHS will be continually observed by staff. When necessary, a behavioral assessment by a licensed mental health professional or registered nurse will occur within one hour of placement on EMHS. Reassessments shall occur during every shift thereafter. In all cases, the patient must have a face-to-face evaluation by a licensed clinician within 24 hours.

18. Instances of suicidal ideation or behavior are rare at the TDF, and have occurred at a historical rate of twice a year. No successful suicide attempts have occurred. Dr. Jumper testified that in the past five-and-a-half years, a nurse performing an initial SMS evaluation has never identified an acute psychiatric need. Plaintiffs did not demonstrate otherwise.

19. If the nurse does not initially identify suicidal or psychotic symptoms, the patient is assessed by a nurse every 12 hours thereafter. The new policy specifies that the mental health assessments must be documented in the clinical charge and administrator-on-duty log during the shift time period.

20. Within two working days after initial placement on SMS, the Behavior Review Committee ("BRC") reviews the SMS determination. During this review process, the patient is afforded an opportunity to present his argument against the SMS decision.

Following the BRC meeting, approximately one-third of the patients are released from SMS.

21. The experts in the present litigation agreed that the patients at the TDF differ in terms of typical diagnostic criteria and symptom profile from those patients typically residing at psychiatric hospitals. Specifically, under the Fourth Edition of the Diagnostic and Statistical Manual for Mental Disorders ("DSM IV") classification system, the predominant Axis I diagnoses for TDF patients falls under the category of paraphilias and sexual disorders. The most common diagnosis is pedophilia; greater than 50% of the patients at the TDF have this diagnosis. Pedophilia is a mental disorder characterized by, among other things, intense sexual urges and behaviors toward prepubescent children. In contrast, the primary diagnoses for patients in forensic psychiatric hospitals fall under the mood or psychotic disorders categories, with schizophrenia, schizoaffective, bipolar I, and severe major depression being among the most common diagnoses.

22. Thus, in a psychiatric hospital population, a significant percentage of patients suffer from severe mental disorders that can interfere with everyday perceptions of reality, including delusions and hallucinations (e.g., schizophrenia), or cause serious suicidal ideation and behaviors (e.g., major depression and bipolar disorder). Many of the patients in psychiatric hospitals have

difficulty with daily living tasks and self-care skills, and have serious interpersonal, behavioral, and cognitive deficits.

23. In contrast, the vast majority of patients at the TDF do not suffer from psychotic or severe mood disorder symptoms. Suicidal ideation or behavior is a very rare occurrence. The patients at the TDF can – and do – perform living and self-care tasks. Although paraphilias and sexual disorders are associated with significant cognitive distortions regarding purported sexual cues from victims, rationalizations of violent behavior, and compulsive and obsessive tendencies, these distortions do not result in the type of widespread impairments in reality testing, as well as other behavioral and cognitive deficits, typically seen in psychotic and serious mood disorders.

24. There is significant disagreement in the psychiatric and psychological community on whether, given the diagnostic and symptomatic profile differences noted above, the seclusion and restraint standards promulgated by the American Psychiatric Association in Task Force Report No. 22 (the "APA Standards") should apply to patients at the TDF. The APA Standards provide specific recommendations on the proper use of seclusion and restraint with individuals suffering from mental disorders. Specifically, the APA Standards require, among other things, an initial written seclusion order, which is time-limited and subject to ongoing review, and a face-to-face clinical evaluation within the first three hours of seclusion. Thereafter, a patient in

- 12 -

seclusion must be monitored every twelve hours. Once the patient is determined to be no longer a threat to himself or others, he should be released from seclusion and/or restraint.

25. The APA standards were based, in part, on concerns over the widespread improper and inconsistent use of seclusion and restraints with patients with serious mental disorders. Historically, treatment staff at psychiatric hospitals tended to use seclusion and/or restraint as a method of punishment or for convenience of the staff to avoid managing difficult patients. Because in psychiatric hospitals violent or disruptive behavior is often the product of a serious mental disorder, the APA Standards provide that seclusion and restraint must be used only for therapeutic purposes, and not punishment. In addition, particularly for individuals with serious cognitive distortions or delusions, the experience of being locked and isolated in a foreign room and/or pinned down in five-point restraints can be extremely traumatic and counter-therapeutic. Thus, in the mental health treatment community, seclusion and/or restraint are considered last-resort alternatives.

26. Although the experts agreed on the diagnostic differences between the TDF patients and traditional psychiatric patients, they did not agree on the implications of these differences to the application of the APA Standards. Drs. Berlin and Metzner, experts for the Plaintiffs, testified that the APA Standards apply to the TDF's operations. In their view, the APA Standards apply equally

to patients in psychiatric hospitals and facilities like the TDF, where decisions are primarily based on dangerousness to self or others. Under Dr. Berlin's view, the central inquiry – and one that requires a trained mental health professional – is whether the assaultive or threatening behavior is a product of a mental illness. Thus, diagnostic differences between patient populations are irrelevant to the inquiry of whether a patient's dangerousness to self or others is caused by a mental disorder, and indeed the APA Standards do not differentiate procedures based on diagnosis.

27. In contrast, Drs. Dvoskin and Tardiff, experts for the Defendants, testified that the APA Standards do not apply to the TDF because of the significant differences in the types of patients there, as compared to psychiatric hospitals. Under their views, the potential that assaultive or self-injurious behavior is a product of an underlying mental disorder is significantly attenuated in a treatment setting like the TDF, where essentially none of the patients meet criteria for psychotic disorders or severe mood disorders. Under this view, the violent behavior that occurs at the TDF is primarily targeted antisocial behavior aimed at disrupting the rules and order of the TDF, as opposed to uncontrollable behavior caused by a mental disorder. Thus, the concerns and policies underlying the APA Standards pertaining to the mistreatment and neglect of the chronically mentally ill simply do not apply in a treatment setting like the TDF.

28. The Court finds by a preponderance of the evidence that the patients detained at the TDF are substantially different in diagnosis and symptom profile from those typically found at forensic psychiatric hospitals (and other similar settings). Patients at the TDF do not routinely suffer from psychotic or severe mood disorders. Although co-morbid major depression is common at the TDF, the absolute rarity of suicidal ideation or behavior, or significant impairment in self-care skills, indicates that the depression (or dysthymia) present is of a lesser severity than that routinely found in psychiatric hospitals. Although patients at the TDF have impaired volitional control regarding sexual urges, they do not have disorders that typically manifest in uncontrollable violent outbursts toward staff or fellow patients, or present serious suicidal risk. Indeed, the evidence showed that the vast majority of TDF patients placed on SMS complied with orders to return to their room without security personnel intervention, and restraints are rarely, if ever, used.

29. Thus, the vast majority of assaultive behavior that precipitates placement on SMS is unlikely to be the product of an Axis I major mental illness. Accordingly, the concerns that future assaultive behavior may be the product of a mental disorder are severely attenuated at the TDF, in comparison to a traditional psychiatric hospital or other inpatient mental health treatment facility.

30. The Court finds that the TDF has made good faith efforts, albeit under the specter of litigation and impending trial, to improve the policy and practices relating to SMS. Following the advice of Dr. Tardiff and others, the TDF has created a written policy that requires immediate administrative review of an STA's preliminary decision to implement SMS. The current policy also properly requires a psychiatric and medical screen by a trained nurse or clinician within one hour of placement in SMS. In addition, on-call psychiatric consultation is available if acute mental health needs are present. Because the new SMS policy was recently drafted and is in the process of implementation, there is limited evidence of the effectiveness of the policy in practice at the TDF.

31. The TDF's prior SMS procedures and practices lacked clear guidelines and requirements for prompt assessment of psychiatric needs by a nurse or any mental health professional. Nurses often did not properly document when (or if) they conducted the psychiatric screen, and it is likely that patients in SMS often did not receive an appropriate evaluation within a one-hour time frame (or perhaps at all).

32. The Court finds by a preponderance of the evidence that there are legitimate safety and security purposes underlying the use of SMS, as it is presently formulated and implemented at the TDF. There are documented instances of assaults by patients on other patients and staff. SMS allows a patient to be removed from

potentially harmful situations where he may injure himself, staff or other patients.

***Use of Close Management Status ("CMS")***

33. Following Secure Management Status, some patients may be placed on Close Management Status ("CMS"). CMS requires patients to wear yellow jumpsuits, and also has certain restrictions on movement and times for exercise or recreation.

34. Under the prior policy, patients were uniformly placed on CMS for thirty days and were required to wear yellow jumpsuits. Under current policy, TDF officials will make individualized decisions pertaining to which patients wear a yellow jumpsuit.

35. The Court finds that there are legitimate institutional security concerns underlying the use of the yellow jumpsuit and other features of CMS. For instance, the yellow jumpsuit allows staff and security personnel at the TDF to identify quickly those patients at greatest risk for assaultive behavior, and facilitates the imposition of appropriate restrictions on movement. The Court also finds that the use of yellow jumpsuit does not carry such a stigmatizing effect that it impedes the effective delivery of treatment or creates a significant counter-therapeutic environment.

***Other Restrictions***

36. Patients at the TDF generally have a wide range of available commissary items, although the availability of certain items may depend upon the patients' behavioral management status.

There was no evidence demonstrating that the restrictions on commissary items are excessive.

37. The use of intercoms within a patient's room facilitates institutional security. There was no evidence demonstrating that the use of such intercoms is a significant imposition on the patients' privacy.

38. The use of a variety of statuses within the TDF that correspond with privileges, including room location, increased freedom of movement, and access to certain commissary items, is not atypical of institutional and quasi-correctional settings. There are rational security concerns underlying the decision to have all patients initially begin at a lower end of the privilege continuum: in many instances, the staff do not initially know the potential risks of a new patient. In addition, making privileges contingent on good behavior and participation in treatment, creates positive contingencies and reinforcements for productive therapeutic behavior.

### B. Claims Pertaining to Treatment, Informed Consent, Access to Treatment and Confidentiality

39. The Consent-to-Treatment form used by the TDF prior September 2004 had an apparent typographical error in the following sentence that omitted the word "each":  "I understand that, when necessary, the treatment team and program-related staff may share information with [each] other about me without my consent."  The current consent form does not have this typographical error.

Although the TDF apparently used a consent form with a blatant and significant typographical error for several years, there was no evidence showing that the treatment staff had relied on this error to share confidential information with others outside of treatment staff.

40. The Consent-to-Treatment form contains a provision notifying patients that treatment records may be provided to the Illinois Attorney General "in order to prepare for court." Under prior policy, TDF staff automatically sent copies of any records requested by a patient to the office of the Illinois Attorney General, without requiring a request from the Attorney General's office or making an individualized assessment of whether the patient was requesting the records in preparation of a court filing. The TDF has since discontinued this policy. Plaintiffs did not show, however, that the Attorney General used any patient information supplied by the TDF for purposes other than preparing for court proceedings.

41. Until recently, the Consent-to-Treatment form included a statement pertaining to Illinois' mandatory reporting law that stated: "any uncharged offense(s) against minors will be reported to DCFS." Although the TDF apparently used this form, which contained an inaccurate statement of the Illinois mandatory reporting law, for several years, the current consent form does not have this particular statement.

42. Until recently, the Consent-to-Treatment form did not contain specific information pertaining to arousal-reducing medications. The current form contains information pertaining to such medications.

43. Patients must sign the Consent-to-Treatment form to receive treatment at the TDF, as the TDF must respect a patient's right to refuse treatment. There are no provisions in the consent form that allow the patient to sign the form, accept treatment, but yet specifically preserve (or claim to not waive) the right to object in a court of law to certain disclosures or other matters presented in the Consent-to-Treatment form.

44. The TDF's treatment program requires patients to disclose in great detail past offenses, including uncharged offenses. There are no immunity provisions insulating the patients from future prosecution based on the disclosure of uncharged offense. The clinical practice at the TDF, however, is to advise patients not to disclose identifying information that would trigger mandatory reporting requirements. There have been three instances where the Illinois DCFS was notified under the mandatory reporting statute. Yet, to-date, no TDF patient has been prosecuted for disclosures within the treatment program.

45. The TDF uses a Psychosexual Testing Consent Form for the administration of the Multiphasic Sex Inventory that contains a hold-harmless and indemnity clause. The test may not be administered nor scored without a properly signed consent form.

The consent form was drafted by the test developers, not the TDF staff. No patient has been denied treatment because of refusal to sign the consent form, nor is the test a prerequisite for participation in the treatment program.

46. Occasionally, some of the meetings between mental health staff and patients occur in the patients' rooms or in the common area directly outside of the patients' rooms. These common areas do not have adequate sound privacy to ensure patient confidentiality.

## *Arousal Reconditioning and Medications*

47. The successful treatment of sex offenders like those treated at the TDF is complicated and may require multi-modal treatment techniques, including cognitive, behavioral, and medical interventions. The Practice Standards and Guidelines for the Members of the Association for the Treatment of Sexual Abusers (the "ATSA") consider arousal reconditioning, relapse prevention (cognitive-behavioral techniques), and medication techniques to be viable treatment interventions for sexual abusers.

48. There is professional disagreement in the psychiatric and psychological treatment fields as to the long-term effectiveness of sexual arousal reconditioning, as practiced at the TDF, in the treatment of sexual abusers. Although clinicians treating sexual offenders continue to use arousal reconditioning as a treatment tool, there is significant research literature indicating that the

effects of arousal reconditioning are short-term and may not significantly reduce recidivism rates. The arousal reconditioning technique, however, may have short-term utility in providing an immediate assessment of a patient's current deviant arousal.

49. Plaintiffs' expert, Dr. Berlin, a recognized expert in the field of treatment for sexual abusers, provided credible testimony showing that arousal reconditioning is typically not sufficient treatment on its own, and may indeed provide very limited value, even when used in conjunction with medications and other cognitive therapy techniques. Dr. Berlin, however, conceded that there are significant numbers of clinicians who continue to believe that arousal reconditioning is an effective cognitive therapy technique for treating sexual offenders. Indeed, the ATSA, a respected professional organization that provides recommended guidelines and standards for sex offender treatment providers, specifically encourages the use of arousal reconditioning techniques.

50. Dr. Schlank, Defendants' expert, credibly testified that techniques such as arousal reconditioning are routinely used in sexual offender treatment programs. She also testified that it is not unusual for such programs to emphasize cognitive techniques at the outset of treatment, and thereafter direct attention toward medications.

51. Dr. Berlin provided credible testimony showing that anti-androgen medications can be an important treatment tool for sexual offenders. Selective Serontinergic Reuptake Inhibitors ("SSRIs")

may also have some utility in the treatment of sexual offenders, although their effectiveness on reducing deviant sexual arousal is likely to be less than anti-androgen medication. There is, however, a danger that patients may over-rely on medications as a purported "cure" and will underutilize cognitive therapy and relapse prevention techniques. Thus, over-reliance on medications may place put patients at heightened risk of a relapse under certain circumstances.

52. Under the prior policy, the TDF treatment staff may have overestimated the utility of arousal reconditioning, and underestimated the utility of anti-androgen medications.

53. The TDF has psychiatric coverage on two days per week, for a total of 16 hours per week. Although the TDF staff concedes that this level of coverage is sub-optimal, particularly as the new treatment policies may substantially increase the use of arousal-reducing medications, it is nonetheless sufficient to cover the core psychiatric needs of the TDF patients.

### Use of the Polygraph

54. The TDF administers the polygraph test as part of its treatment program. The TDF uses a polygraph technique called the Control Question Technique (the "CQT"). The polygraph is used to assess, among other things, the truthfulness of patients' disclosures about past offenses.

55. There is significant professional disagreement about the reliability and validity of the CQT administration, as well as the proper role of the polygraph in the treatment of sex offenders in general. There is substantial research literature indicating that the CQT is unreliable and overestimates untruthful responses. Dr. Iacono, Plaintiffs' expert on the polygraph, however, conceded that there are recognized experts in the scientific community, although they tend to train at one particular research institution, who believe the CQT is a scientifically valid procedure for the polygraph. In addition, many departments of the federal government, including the FBI, routinely use the CQT.

56. Independent of the reliability or validity of the polygraph instrument as a purported "lie detector," it can be an effective treatment tool because it can facilitate patient disclosures regarding past offenses. That is, simply administering a polygraph test may encourage certain patients to make truthful disclosures before or after the test.

57. Patients who fail the polygraph examination generally cannot advance beyond Phase II in the treatment program. There was evidence, however, that patients who failed the polygraph (or have inconclusive results) can complete other work in advanced phases of the program, and even can obtain release. Thus, a failed polygraph examination is not an insurmountable obstacle to release from the TDF.

58. Under prior policy, the TDF Polygraph Review Committee reviewed only a subset of polygraph results and may have overestimated the utility of the polygraph in detecting untruthful responses. Under current policy, the Polygraph Review Committee will review all polygraph test results.

### *Progress of Treatment and Prospects of Release*

59. The TDF core treatment program comprises five phases, each with different treatment tasks and goals. Phase 1 (Assessment) involves initial treatment evaluation and baseline measurements. Phase 2 (Accepting Responsibility) includes use of the polygraph, extensive written descriptions ("journaling") of past offenses, and cognitive restructuring techniques aimed at correcting distortions that relate to sex offending. Phase 3 (Self-Application) includes relapse prevention techniques, which involve detailed assessments of the situational, behavioral and cognitive variables associated with offending, as well as continued cognitive restructuring and journaling work. Phase 4 (Incorporation) incorporates the prior three phases and helps the patient formulate a "wellness" plan. Finally, Phase 5 (Transition) plans the patient's reintroduction into the community.

60. The TDF core treatment program provides approximately 15 hours of direct sex offender treatment per week. According to Dr. Schlank's unrebutted testimony, this amount of treatment is somewhat higher than other similar treatment programs. In addition

to the 15 hours of treatment, there are other ancillary treatment programs provided.

61. In general, the treatment program provides coherent treatment goals and provides an overall roadmap for progress.

62. Participation in treatment at the TDF, however, is quite low. Less than 50% of patients participate in core treatment. There are a variety of reasons why patients do not participate in treatment. Some patients do not participate because they disagree with the treatment methods, consent forms, and/or disclosures to the Attorney General. Others do not participate because they may have been advised by their attorneys not to participate in treatment pending resolution of this case and/or other court appeals.

63. Certain members of the TDF staff recognize that participation in treatment is excessively low and have engaged in efforts to increase outreach to patients. The recent policy changes, including review of polygraphs, more-carefully delineated SMS procedures, clarification of the confidentiality provisions, increased use of anti-androgen medications, more individualized assessments of threat risks, elimination of strip searches, as well as resolution of this litigation, should provide incentives for increased participation in treatment.

64. Given the chronic and severe nature of the paraphilias and sexual disorders suffered by patients at the TDF, the course of treatment to date is not inappropriately long. The treatment

program appropriately focuses on behavioral changes as the sign post for release, rather than fixed time periods. Moreover, completion of all phases of treatment is not an absolute prerequisite for release from the TDF: some patients have been released without completing all phases of treatment.

65. There is significant treatment value in having patients provide some form of written description of past offenses (the so-called "journaling" technique). Under prior policy, however, the journaling process in Phase II was overemphasized and excessively time-consuming in relation to other aspects of the treatment program. Under current policy, the process of journaling is more streamlined, having moved to a "categorical offense" description model. This should facilitate greater patient success in Phase II of the treatment program.

66. Since the program's inception more than five years ago, approximately 10 patients have been released. The large majority of these patients, however, had not completed all phases of the treatment program. In addition, several of the patients were released by court order, against the recommendation of the independent consultant hired by TDF to make release recommendations. The rate of release, although notably low, is not unusual, given the complexity of psychological issues facing TDF patients, coupled with the low participation rates in treatment.

### Accreditation

67. The TDF is not accredited by the Joint Commission of Accreditation of Healthcare Organizations (the "JCAHO") or the Commission on Accreditation of Rehabilitation Facilities (the "CARF"). In June 2003, the TDF performed a "mock" CARF review and determined that it had not formalized its policies sufficiently in writing to pass CARF accreditation. CARF accreditation is generally considered to have less stringent requirements than JCAHO.

### Other Issues Raised in the Complaint

68. *Staff training*. The TDF treatment staff is sufficiently trained and informed in the treatment of sexual deviance. The TDF treatment staff has the proper credentials for the tasks performed.

69. *Individualized treatment plans*. The treatment plan for the patients is sufficiently individualized to meet patient needs, and, as noted above, the treatment program provides a coherent road map and goals for treatment progress.

70. *Family participation in treatment*. There was no evidence demonstrating that family members are unreasonably excluded from participating in treatment or visiting.

71. *Grievance procedures*. The TDF has established sufficient grievance procedures. For instance, the evidence showed that the Behavioral Review Committee conducts hearings to address patients' grievances regarding SMS. In addition, there was evidence showing

that patient committees are involved in providing feedback to treatment and administrative staff, and reasonable accommodations have been made.

72. *Education, Religious, Vocational, and Recreational Activities.* There was no evidence demonstrating that the TDF fails to afford reasonable educational, religious, vocational or recreational activities.

### III. **CONCLUSIONS OF LAW**

#### A. **Standard of Review for Constitutional Claims**

1. Plaintiffs' constitutional challenges to the conditions of confinement and treatment fall broadly under the "professional judgment standard." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). Under this standard, decisions made by trained professionals are entitled to a presumption of correctness. *See id.* at 324. Constitutional violations will be found only when administrative or clinical decisions pertaining to confinement and treatment are a "substantial departure from accepted professional judgment, practice or standards." *Id.* at 323. In addition, courts may not "specify which of several professionally accepted choices should be made," but rather only "make certain that professional judgment in fact was exercised." *Id.* at 321. Thus, this Court's review of the TDF's practices is very limited: it can intervene only if Plaintiffs have established that TDF's practices are "such a *substantial* departure from accepted professional judgment,

- 29 -

practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* at 323 (emphasis added).

2. Persons who have been involuntarily committed are entitled to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321-22. The Constitution, however, does not require that the patients at the TDF receive "optimal treatment," but rather minimum levels of care are sufficient. *West v. Schwebke*, 333 F.3d 745, 749 (7th Cir. 2003); *see also Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). "[A]ll the Constitution requires is that punishment be avoided and medical judgment exercised." *West*, 333 F.3d at 749.

3. The SVP Act contains a provision that specifically exempts the TDF from complying with the Mental Health and Developmental Disabilities Code (the "MHDDC" and the "MHDDC exemption"). 725 ILCS 207/50(b)(West 2004). The MHDDC provides a series of rights and procedural requirements for mentally ill individuals, including significant limitations on the use of seclusion and restraint. *See* 405 ILCS 5/2-108 and 405 ILCS 5/2-109. Defendants argued repeatedly at trial (and in their post-trial brief) that the MHDDC exemption is an affirmative defense that precludes Plaintiffs from challenging any practices that are required under the MHDDC. In particular, Defendants argue that the MHDDC exemption precludes the

TDF from being required to comply with the APA Standards on seclusion and restraint. *See, e.g.,* Def. Post Trial Br. at 20-21.

4. Defendants' line of reasoning here is not particularly well-developed, but they appear to argue that because the APA Standards are functionally equivalent to the MHDDC provisions on seclusion and restraint, Plaintiffs' argument runs headlong into the MHDDC exemption. *See id.* 20-21. In addition, Defendants seem to argue that because Plaintiffs have not mounted a facial challenge to the MHDDC exemption, they must be precluded from allowing a *de facto* invalidation of this statutory provision via application of the APA Standards. *See id.* at 6-7, n.9.

5. Defendants' argument on the MHDDC exemption is unconvincing. First, Defendants provide no authority for the proposition that a party challenging practices at a state-operated facility _must_ also raise a facial challenge to any underlying statutory authority related to such practices. Nothing in *Youngberg* or its progeny suggests that such a facial challenge is a procedural prerequisite. Second, and relatedly, Defendants misunderstand the legal implications of a Plaintiff victory on this issue. Specifically, a finding that the APA Standards apply under *Youngberg* is not tantamount to the distinct finding that the MHDDC exemption is constitutionally invalid. Procedurally, the issue of the constitutionality of the MHDDC exemption is not before this Court. It may be that *Youngberg* requires the TDF to follow certain

seclusion and restraint practices that happen to overlap with provisions in the MHDDC, but it is incorrect to consider that equivalent to a legal finding that the MHDDC provision is unconstitutional. Indeed, there are numerous provisions in the MHDDC that would remain untouched by a finding that the APA Standards apply, and, moreover, nothing in the MHDDC exemption forbids the TDF from complying with the APA Standards. Rather, properly read, the plain language of the MHDDC exemption merely suggests that the MHDDC itself cannot provide a toehold for legal liability – and Plaintiffs indeed are not relying on the MHDDC provisions. Finally, Defendants ignore (or misunderstand) the fundamental concept that states cannot create statutory schemes that evade the requirements of the United States Constitution. That is, nothing in the SVP Act itself can serve as an affirmative defense that protects the TDF from comporting with the constitutional requirements specified in *Youngberg.*

### *Standard on Review Regarding Mootness of Claims*

6. As noted above, Defendants altered many of the challenged policies, including several at the last minute, on the eve of trial. As a result of these changes, Defendants now claim that many of the Plaintiffs' claims are effectively mooted. Plaintiffs respond that many – if not all – of the policy changes are merely "adjustments of convenience" for the purposes of prevailing in the

litigation, rather than bona fide and long-term shifts in policy and practice.

7. To prevail on their claim of mootness, Defendants face a heavy burden:  they must show that subsequent events have "made it absolutely clear that the allegedly wrong behavior could not reasonably be expected to recur." *See, Friends of the Earth*, *Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000). Defendants must show that "there is no reasonable expectation that the wrong will be repeated." *Id.* (citation omitted).

8. The Court finds that Plaintiffs' claims pertaining to the strip searches and the Consent-to-Treat form are mooted by Defendants' policy changes because Defendants have shown that there is no reasonable expectation that they will systematically return to former procedures.  For instance, the TDF expended considerable funds on the Rapiscan device and has in place a reasonable maintenance plan to ensure its continued operation.  Although it is possible that the device may break down and require a temporary return to strip searches, this outcome is too speculative (and infrequent) to amount to a cognizable claim.  The Consent-to-Treat form omitted or changed the objectionable language, and added language pertaining to medications – these are essentially the changes requested by Plaintiffs – and there was no indication at trial that the Defendants intended to return to the old consent forms.

9. Plaintiffs' other claims are not mooted by the recent policy changes. The vast majority of these changes occurred on the eve (or even during) trial and thus have yet to become established practice. For instance, Defendants themselves acknowledged that the intended changes to the polygraph, SMS, and CMS procedures were not yet fully implemented. As noted above, the Court finds that Defendants have made good faith efforts to improve the program in various ways and intend to convert these new policies into established practice. This good faith finding alone, however, is insufficient to meet the heavy burden of showing that there is no reasonable expectation that past policies will be repeated, particularly as Defendants have maintained throughout this litigation that their past policies were entirely adequate. In addition, Plaintiffs maintain that even the new procedures are, for the most part, constitutionally inadequate. Thus, the Court will reach conclusions of law based on both the old and the new procedures in these areas.

### The Conditions of Confinement

10. Facility administrators are afforded wide latitude to maintain institutional security, internal order, and ensure the protection of patients and staff. *See Youngberg,* 457 U.S. at 322-23; *West,* 333 F.3d at 748. Professional decisions made by appropriately trained personnel are entitled to a presumption of correctness. *See Youngberg,* 457 U.S. at 324. Measures employed by

institutions to ensure security and order are permissible non-punitive interventions. *See id* at 322-24.

11. Here, there is an established history of patients acting in threatening and assaultive ways toward the staff and other patients at the TDF. Contraband items that could be used as weapons have been found. In addition, the criteria for being detained at the TDF include the commission of at least one sexually violent act, and previous violent acts are important predictors of future violence. *See Kansas v. Hendricks*, 521 U.S. 346, 358 (1997) (citations omitted). Indeed, the large majority of patients at the TDF have repeatedly engaged in acts of sexual violence, some with adults. Most TDF patients, however, do not appear to be generally violent, but rather target specific victims, most often children. Thus, it cannot be said that this is a population particularly prone to assaulting staff, and indeed the large majority of violent episodes involving patients and staff appear to be limited to a smaller cluster of patients.

12. Although the configuration of the facility and the level of restrictions may be excessive in light of this patient population, this Court has only limited discretion to review the TDF's administrative and security decisions. Defendants' decisions (with the exception of its prior policy on SMS, as discussed below) fall under the purview of reasonable professional judgment in the administration of a hybrid detention and treatment facility. Thus,

whether under old or new policies, the restrictions of movement, the room and personal searches, use of the black box, use of close management status, and use of intercoms, are not substantial departures from accepted professional judgment and standards, and therefore are constitutionally permissible. Specifically, as noted above under the Findings of Fact, there are legitimate security and institutional concerns underlying these policies that indicate that professional judgment is being properly exercised.

13. The new policies pertaining to conditions of confinement, however, are clearly superior to old practices, and will likely facilitate increased patient participation in successful treatment, which is, after all, one of the main purposes of the SVP Act.

14. With regard to Defendants' procedures pertaining to the use of secured or special management status ("SMS"), the Court finds that the APA Standards (and other similar professional standards cited by the Plaintiffs) do not apply wholesale to the use of SMS. First, the concerns underlying the APA Standards, namely that the behavior in question is the product of a mental disorder, are significantly attenuated under the present circumstances because the patient population is significantly different from that found in psychiatric hospitals. *See In re Samuelson*, 727 N.E.2d 228, 237 (Ill. 2000)(noting the differences between persons committed under the SVP Act versus te Illinois Mental Health Code); *see also In re Treatment and Care of*

*Luckabaugh*, 568 S.E.2d 338, 346 (S.C. 2002)(citations omitted) (noting how violent sex offenders are a different class of committable individuals). Second, the SMS procedures are significantly different from the typical use of seclusion and restraint in psychiatric hospitals. Patients at the TDF are not secluded in designated seclusion rooms, devoid of personal artifacts or other comforts, but rather are confined in their own rooms, with access to all their personal belongings. *Cf. West*, 333 F.3d at 747 (describing the different type of "therapeutic seclusion" used in the Wisconsin SVP program, where patients were placed in a room that contained only a concrete platform for a bed, and were often deprived of clothing and other personal items and amenities). In addition, patients are not physically restrained once inside their rooms.

15. Thus, the nature of the precipitating behavior and the actual implementation of SMS is substantially different from the types of behaviors and procedures addressed by the APA Standards. Accordingly, rigid adherence to the entire protocol specified by the APA standards is not constitutionally required. *See West*, 333 F.3d at 749 (noting that "the Constitution does not immediately fall into line behind the majority view of a committee appointed by the American Psychiatric Association" and "[i]n a world of uncertainty about how best to deal with sexually dangerous persons, there is room for both disagreement and trial-and-error.").

Moreover, even if the APA Standards applied here, this is not a negligence case where any deviation from the standard of care could impose liability. *See Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir. 1998)(contrasting the professional judgment standard with negligence and intentional misconduct standards). Instead, the controlling standard in a constitutional challenge requires a *substantial* departure from accepted practices or standards. *See Youngberg,* 457 U.S. at 323. As shown directly below, the TDF's procedures are not such a substantial departure from the protocol under the APA Standards.

16. Although the APA Standards do not control the determination of what constitutes professional judgment in the context of the TDF's use of SMS, they nevertheless inform this determination. For instance, the APA Standards recommend that there be a timely and documented initial psychiatric and medical screen shortly after placement in seclusion. This recommendation appears to be universally endorsed by the psychiatric community. Indeed, there was a consensus among the testifying experts that professional judgment in this area requires, at a minium, a timely assessment of potential mental health needs. In fact, the TDF's own expert, Dr. Tardiff, specifically recommended and guided the change in policy that now clearly requires a documented psychiatric screen within one hour of placement in SMS.

17. Given the differences in patient populations and the procedures at the TDF, staff may exercise its professional judgment in applying and modifying pertinent portions of the APA Standards (and other professional standards). For instance, the TDF's decisions to allow security personnel make the preliminary determination of SMS, to have a nurse make the initial psychiatric screen, and to amend the time period for subsequent observations all reflect the exercise of professional judgment in light of the patient population at the TDF. In fact, the competing testimony provided by recognized experts in this case pertaining to the TDF's SMS procedures show that there is, at most, bona fide professional disagreement about whether, and in what fashion, the APA Standards map onto the SMS procedures at the TDF. Indeed, Defendants' key expert, Dr. Tardiff, was the chairperson on the APA Standards task force, and yet testified that they did not apply in this treatment setting. (Plaintiffs note that Dr. Tardiff's testimony may not have been the model of consistency, considering his prior testimony in a Wisconsin case, but the Court notes that the seclusion practices at the Wisconsin facility were indeed different, *see West*, 333 F.3d at 747, and that Dr. Tardiff's observation regarding patient differences was effectively supported by Plaintiffs' own experts.)

18. The TDF's prior policy did not clearly require a timely psychiatric and medical assessment. Even though the concerns

regarding suicidality and other products of mental disorder are attenuated in this population, they are certainly not entirely absent. Professional judgment dictates that patients placed in seclusion (or, under the circumstances here, quasi-seclusion is a more-appropriate term) must receive, at a minium, an initial psychiatric screen, which must be well documented for other treatment staff. Thus, the TDF's prior policy did not meet constitutional requirements on these grounds.

19. Although the Court finds that the new SMS policies are not sufficiently established to meet the high burden of mooting Plaintiffs' claims, it finds that Defendants have made a sufficient showing that the new policy is in fact being implemented at the TDF. Thus, there is no need for the imposition of the extraordinary remedy of injunctive relief, in light of Defendants' current policies and practices. Although Plaintiffs argue that the last-minute policy changes are merely temporary litigation strategy, and, moreover, the staff at the TDF lacks the ability to implement the new SMS policies effectively, the Court finds that this litigation has caused a good faith reexamination and change in the insufficient past SMS policy. Moreover, the Court finds that Defendants presented credible testimony of their intention to adhere to the recent policies presented at trial.

## *The Claims of Inadequate Treatment*

20. As noted above, the Constitution does not require optimal treatment. *See Youngberg*, 457 U.S. at 319; *West*, 333 F.3d at 749. All that is required is minimally adequate treatment to protect a patient's liberty interests. *See Youngberg*, at 319. The TDF's treatment practices can be found unconstitutional only if the practices are such "a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323.

21. In a previous opinion in this case, this Court relied on the *Youngberg* standard, but also cited Third and Eleventh Circuit authority for the proposition that an involuntarily civilly committed person is entitled to treatment that provides "a meaningful chance to improve and win his eventual release." *Hargett v. Baker*, 2002 WL 1732911, *2-3. At that early stage in the litigation, it was possible that the treatment claims articulated by Plaintiffs fell within the gap that the Supreme Court in *Youngberg* declined to address: specifically, whether an involuntarily committed person has "some general constitutional right to treatment *per se*, even when no type or amount of training would lead to freedom." *Youngberg*, 457 U.S. at 318; *see also D.W. v. Rogers*, 113 F.3d 1214, 1218, n.5 (11th Cir. 1997). At this stage, however, it is clear that the "minimal treatment" standard

articulated in *Youngberg* is the proper controlling standard.  In addition, the Supreme Court has noted that the Constitution does not "prevent[] a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others."  *Kansas v. Hendricks*, 521 U.S. 346, 366 (1997).  Moreover, even if a "meaningful chance to improve" were part of the standard here, it is clear that the TDF treatment program does provide such "meaningful chance."

22. The types of chronic sex offenders who reside at the TDF are notoriously difficult to treat.  They suffer from extreme and difficult-to-control sexual urges, which may have complicated biological, behavioral and cognitive causal factors.  Many suffer from a variety of co-morbid problems that complicate the treatment picture, such as substance abuse, mood, and personality disorders. In addition, many patients at the TDF are reluctant to seek treatment and have an extensive history of reoffending.  In short, this is a chronic, severely disturbed patient population with a multiplicity of serious and complex psychiatric difficulties.  This is certainly not the typical outpatient "worried well" or depressed patient, who can be successfully treated with short-term cognitive-behavioral therapy and/or antidepressant medication.

23. Thus, the clinical staff at the TDF is faced with the unenviable competing tasks of providing adequate treatment at a pace to allow sufficient progress for potential release, while

simultaneously ensuring that patients are not released prematurely into the community to reoffend. The latter task is not to be taken lightly, as the recidivism rates of sex offenders are tragically high. This, of course, is the principal rationale behind the SVP Act.

24. In light of these challenging tasks, the Court finds that the treatment program and delivery of services at the TDF adequately meet constitutional requirements. Specifically, the TDF's use of arousal reconditioning and polygraph techniques are well within the bounds of professional judgment. While arguably the TDF may have over emphasized these techniques in its treatment regimen, there is certainly widespread acceptance and use of these techniques in the sex offender treatment community. Thus, it cannot be said that the TDF's use of such techniques is a substantial departure from accepted practices and standards. *See* *Youngberg* 457 U.S. at 323.

25. Similarly, the TDF's use of arousal-reducing medications, while perhaps not optimal, is clearly within constitutional bounds. As noted above, there is reasonable professional disagreement as to the timing, dosage, and type of medications that are most effective in reducing deviant sexual arousal. Dr. Berlin, an undisputed expert in this area, represents one end of the professional continuum on the use of anti-androgen medications, but his testimony, coupled with that of Defendants' experts, fairly shows

nothing more than bona fide professional disagreements, and these seldom, if ever, amount to constitutional violations, provided there are sufficient numbers of respected professionals on each side. *Youngberg*, 457 U.S. at 322-23.

26. The low rates of treatment participation, progress, and release at the TDF are disappointing, but do not amount to constitutional violations. As noted under the factual findings, there are a multiplicity of reasons why patients do not participate in treatment, and only some of these can be laid on the doorstep of TDF policies and practices. The treatment program has a coherent overall plan and sequence, with identifiable goals and standards. This is not to say that the treatment program is ideal: particularly under past practices, certain treatment tasks were excessively time-consuming or ill-defined, such as the former "journaling" approach under Phase II.

27. The primary impediment, however, to achieving greater success in the program is the severity and chronicity of the patient population. Taken together, there was insufficient testimony demonstrating that the structure or administration of the treatment program was such a substantial departure from professional judgment that it amounts to constitutionally deficient treatment. *See Youngberg*, 457 U.S. at 322-23.

28. The confidentiality practices of the TDF, although, again, perhaps not optimal, do not amount to a constitutional violation.

In particular, there was evidence that certain patient-therapist
interactions occurred in the common areas near other patients'
rooms.    This    lacks    adequate    sound    privacy    to    maintain
confidentiality,    but    such    activities,    although    not    desirable
practice,    are    not    such    a    substantial    departure    to    trigger
constitutional relief. The disclosures to the Illinois Attorney
General under prior policy, although apparently excessive in light
of the provisions for disclosure under the SVP Act, do not amount
to a constitutional violation.    For instance, there was credible
testimony by Dr. Wood that he believed the disclosures were to be
used   by   the   Attorney   General   for   preparing   for   court,   and
Plaintiffs did not present evidence to show otherwise.    Moreover,
this former practice has been discontinued.

        29. The absence of accreditation by JCAHO or CARF does not
amount to a constitutional violation.    The facility clearly could
benefit   from   further   development   and   refinement   of   written
policies, and accreditation by an appropriate organization may
provide   additional   and   valuable   oversight.      Accreditation   by
itself, however, is not a litmus test for the constitutionality of
the practices at the TDF.    Instead, the Court must look to the
actual practices, and, as noted above, they pass constitutional
muster for a variety of reasons.

        30. Finally, the remaining claims raised by Plaintiffs in
their complaint or at trial pertaining to staff training, family
participation, grievance procedures, individual treatment plans,

discharge planning, and educational and vocational training had thin – if any – evidentiary support at trial. Plaintiffs certainly did not establish that the TDF's practices in these areas amounted to constitutional violations.

### IV. CONCLUSION

For the reasons stated herein, Plaintiffs' demand for Declaratory Relief is **GRANTED** insofar as the TDF's prior SMS was unconstitutional and Defendants failed to establish that Plaintiffs' claim on this issue was moot, but any remaining claims for declaratory relief are **DENIED.**

Because the TDF has made the requisite showing that the new SMS policy cures the defects in the prior policy, Plaintiffs' demand for injunctive relief is **DENIED** with respect to this and all other claims.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: January 13, 2005